IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                        NO. 24-CR-1023 DHU

IVAN LUJAN,

    Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant's Motion to Suppress Evidence Derived as a Result of an Invalid Seizure and Search. Dkt. 37. The Government responded in opposition, Dkt. 40, and Defendant replied, Dkt. 48. The Court held an evidentiary hearing on the Motion on June 5, 2025, and the parties filed written closing arguments on July 3, 2025. Dkts. 68, 69. Having considered the parties' briefs, the record of the case, hearing testimony, arguments, relevant law and being otherwise informed, the Court finds that Defendant's Motion shall be **GRANTED**.

## I.
## FACTUAL BACKGROUND

On November 12, 2015, Defendant Ivan Lujan ("Defendant") pleaded guilty to the federal crime of being a felon in possession of a firearm. *United States v. Lujan*, No. 15-CR-4009-MV, Dkt. 17. The district court sentenced Defendant to 51 months of imprisonment to be followed by a three-year term of supervised release. *Id.*, Dkt. 23. Defendant's supervised release contained several special conditions, including the following search condition:

> You must submit to a search of your person, property, residence, vehicle, papers, computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media, or office under your control. The probation officer may conduct a search under this condition only when reasonable suspicion exists, in a reasonable manner and at a reasonable time, for the purpose of detecting drugs, alcohol, weapons, and any other contraband. You must inform any residents or occupants that premises may be subject to a search.

1

Hr'g. Ex. 1.[1]

On January 20, 2020, Defendant was released from the custody of the Bureau of Prisons and commenced his term of supervised release. From the date of his release through mid-2021, Defendant was alleged to have violated various terms of his supervised release. No. 15-CR-4009-MV, Dkt. 28. On September 13, 2021, the district court revoked Defendant's supervision, finding that Defendant had violated the terms of his supervised release and sentenced him to four months of imprisonment to be followed by another 32 months of supervised release. *Id.*, Dkt. 51. The sentence again included special conditions, one of which again required Defendant to submit to a search of, among other things, his person, property, residence, and vehicle, and again stated that the "probation officer" could conduct such a search for drugs, alcohol, weapons and other contraband when reasonable suspicion existed. *Id.*, Dkt. 48. On December 8, 2021, Defendant completed his sentence and commenced his new term of supervised release. *Id.*, Dkt. 67.

On November 30, 2023, while Defendant was still on supervised release, agents with the Drug Enforcement Administration (DEA) executed a search warrant for narcotics at a home where Defendant was residing. June 5, 2025, Motion Hearing Transcript ("Mot. Hr'g Tr.") at 13:2-11.[2] Inside the home, the DEA found four fentanyl pills and about $50,000 in cash. *Id.* at 161, 171:15-20. On December 6, 2023, pursuant to a petition alleging a violation of supervised release in 15-CR-4009-MV, an arrest warrant was issued by the district court for Defendant's arrest. No. 15-CR-

---

[1] All citations to "Hr'g. Ex." refer to the exhibits introduced during the evidentiary hearing on June 5, 2025. *See* Dkt. 62-1.

[2] This transcript is attached to the United States' Summation Brief. *See* Dkt. 68-1.

4009-MV, Dkt. 78; Mot. Hr'g Tr. at 14, 43. The execution of the arrest warrant was to be conducted by the U.S. Marshal's Fugitive Task Force.[3] *Id.* at 44:9-11, 137:6-7.

On January 29, 2024, Special Deputy U.S. Marshal ("SDUSM") Mathew Salcido, a member of the U.S. Marshal's Fugitive Task Force,[4] obtained a search warrant for the GPS location of a telephone believed to be used by Defendant. *Id.* at 44:12-15. From that date until February 2, 2024, SDUSM Salcido and other U.S. Marshal's Task Force officers obtained information that the phone was "pinging"[5] on Shannon Place N.W. in Albuquerque, New Mexico. *Id.* at 46:2-8, 133-134.

On February 2, 2024, officers with the U.S. Marshal's Task Force initiated an operation to arrest Defendant. *Id.* at 17. Based on the cell phone information, U.S. Marshal's Task Force Officer ("TFO") Mitch Bengston[6] went to Shannon Place N.W. *Id.* at 133:25-134:6. TFO Bengston observed a gold-colored Honda sedan pulling out of a home on the north side of Shannon Place. *Id.* at 134. He relayed that information to other officers involved in the operation. *Id.* at 134-135. SDUSM Salcido testified that the officers had information from a confidential informant that

---

[3] The U.S. Marshal's Fugitive Task Force consists of U.S. Deputy Marshals as well as law enforcement officers from various local, state and federal agencies who are cross-commissioned to work as Task Force Officers and assist the U.S. Marshal Service in locating and apprehending federal fugitives and conducting high profile investigations. *See* https://www.usmarshals.gov/what-we-do/fugitive-investigations/fugitive-task-forces; Mot. Hr'g Tr. at 10:13-11:11.

[4] Task Force Officer Salcido testified that he was a deportation officer with U.S. Immigration and Custom Enforcement. Mot. Hr'g Tr. at 10:5-8.

[5] The "pinging" of a cellular phone occurs when its location is identified through the triangulation of GPS coordinates by a phone carrier pursuant to a search warrant. Mot. Hr'g Tr. at 16:5-13.

[6] TFO Bengston is a New Mexico State Police Officer. Mot. Hr'g Tr. at 29:9-10.

Defendant was possibly driving a gold sedan.[7] *Id.* at 17. TFO Bengston was not able to see who was driving the car. *Id.* at 92:12-20.

Based on the information from TFO Bengston, SDUSM Salcido testified that he drove to Chelwood Place to be on the lookout for the gold sedan because he had information from DEA Agent Mondragon that Defendant frequented a location on that street. *Id.* at 20. Upon arriving at the Chelwood address, SDUSM Salcido saw an individual that he thought was Defendant exit the gold sedan and walk up the stairs to an apartment. *Id.* at 21. Salcido recognized Defendant because Defendant was present during the DEA's search warrant execution on November 30, 2023. *Id.* at 13, 21-22. SDUSM Salcido obtained the license plate number of the sedan. *Id.* at 21. Agent Mondragon testified that he then received a call from SDUSM Salcido with the license plate number, which Mondragon ran through his system. *Id.* at 172:1-8. Agent Mondragon testified that he provided the name of the registered owner of the gold sedan to SDUSM Salcido at some point before Defendant was arrested later that day. *Id.* at 172:9-22.

Eventually, Defendant left the Chelwood apartment. *Id.* at 22. SDUSM Salcido notified the Task Force and requested assistance. *Id.* SDUSM Salcido, TFO Bengston, and several USMS Deputies responded to the area to prepare for an arrest attempt. *Id.* at 95. At approximately 3:30 p.m., the officers observed Defendant pull back into the driveway of 237 Shannon Place N.W. driving the gold-colored sedan. *Id.* at 49. Defendant parked on the driveway to the right of the residence's garage door. *Id.* at 53:2-9. The sedan did not block the garage. *Id.* at 6-7.

As Defendant exited the vehicle, SDUSM Salcido and TFO Bengston approached and announced law enforcement's presence. Hr'g. Ex. 2 (TFO Bengston Body Camera). The Task

---

[7] Defendant was not driving a gold sedan in November 2023 when the DEA found four fentanyl pills at the home where he was residing. Mot. Hr'g Tr. at 171:21-25.

Force arrested Defendant without incident as he stood outside the residence. *See id.* TFO Bengston performed a search of Defendant's person incident to his arrest. Mot. Hr'g Tr. at 98. Inside Defendant's front pocket, TFO Bengston located cash wrapped in plastic Saran wrap, which was later determined to be approximately $4,240. *Id.* SDUSM Salcido testified about the significance of Saran-wrapped cash:

> Oftentimes, the individuals that are trafficking narcotics, wrap or Saran wrap or pressure seal their proceeds. Sometimes when they are paid off, they get a certain amount that's wrapped up, here you go, this is it, so they are not counting it out sometimes. It just varies.

*Id.* at 36:16-37:9. TFO Bengston testified that "the only time I've seen cash wrapped [in Saran wrap], it was part of narcotics trafficking." *Id.* at 98:15-17. The officers did not find any drugs on Defendant. *Id.* at 137:21-22.

Upon arresting Defendant, officers opened at least one door to Defendant's parked car and cleared the vehicle, the stated purpose of which was to ensure there were no other occupants or threats in the vehicle. *Id.* at 56:5-12, 78:11-79:4. After clearing the vehicle, the door was left open. *Id.* at 56:16-22.

Officers asked Defendant if the Shannon Place N.W. residence was his, and though he said it was not, the officers did not ask him if he had been staying at the home. *Id.* at 138:17-139:3. The officers did not ask Defendant what he wanted done with the sedan. *Id.* at 146:9-11. SDUSM Salcido and TFO Bengston testified that Defendant stated the car was not his. *Id.* at 30, 103. Though the officers had the name of the sedan's registered owner before arresting Defendant, *id.* at 172:2-22, they did not ask Defendant if he had a phone number for the registered owner, *id.* at 146:12-14. The name of the registered owner was familiar to Agent Mondragon because Defendant had previously delivered a bag of narcotics to her. *Id.* at 165:3-11. When the officers later executed

a search warrant on the vehicle, they found documents on the front passenger seat in the vehicle that showed the registered owner's phone number. *Id.* at 173:7-175:24.

During the officers' exchange with Defendant at the scene, he stated he "hadn't knocked yet" and he was there to "see if the girl was here." Hr'g. Ex. 2 at 03:16-03:44; Hr'g. Ex. C-1 at 5-7. TFO Bengston then knocked on the home's door, but he did not make contact with anyone. *Id.* at 105:5-106:2. TFO Bengston told SDUSM Salcido, "She's not answering. I don't want to leave this unlocked. What are your thoughts on keys?" *Id.* at 141:1-7. As TFO Bengston asked about keys, SDUSM Salcido was already inside the car searching it. *Id.* at 141:5-14.

As depicted in the body camera video, SDUSM Salcido entered the interior of the car as soon as TFO Bengston said no one had answered the door of the home, and the officers began searching the vehicle before they spoke at all about impounding it. Hr'g. Ex. 2 at 6:53-7:00; Mot. Hr'g Tr. at 58:10-59:1.[8] While SDUSM Salcido searched the front of the vehicle, TFO Bengston opened the rear door and went into the backseat area. *Id.* at 59:2-5. TFO Bengston picked up a backpack and then said, "backpack's empty…no, it's not." Hr'g. Ex. 2 at 6:53-7:15. TFO Bengston testified that at that time he saw a clear bag that contained what he believed to be methamphetamine inside the backpack. Mot. Hr'g Tr. at 110:14-19. SDUSM Salcido testified that he then looked inside the backpack and also saw what he believed to be methamphetamine. *Id.* at 59:20-21. TFO Bengston continued to the trunk where he found a wrapped gift. Hr'g. Ex. C at

---

[8] At the motion hearing conducted by the Court, SDUSM Salcido described the search as an "inventory search," only conducted to "ensure the security of belongings that are in the vehicle and are documented and recorded, that way, when the vehicle was towed and later recovered by the owner, there aren't any missing items of value thus alleviating the arresting agency from litigation." Mot. Hr'g Tr. at 33:1-8. However, as depicted by the video evidence in this case and discussed during the cross-examination of TFO Bengston by counsel for Defendant, while searching both the front and rear area of the gold sedan, officers did not appear to document items they found and did not utilize an inventory form during the search. *Id.* at 143:16-144:11.

6:50-7:52. TFO Bengston then asked SDUSM Salcido, "Do you want to drag this away?" and Salcido responded, "I'm thinking so." *Id.* SDUSM Salcido contacted DEA Agent Mondragon, who then arrived on scene and drove the sedan back to the DEA office. *Id.* at 33-34, 167.

While the officers were on scene, some neighbors told the officers that 237 Shannon Place N.W. was an Airbnb. Mot. Hr'g Tr. at 51:3-10. One neighbor said he was going to call the owner of the Airbnb, and though he was unable to reach the owner, officers did not ask for the Airbnb owner's phone number before taking the sedan away. *Id.* at 21-52:19.

On February 6, 2024, Agent Mondragon obtained a search warrant for the sedan. The next day, investigators executed the search warrant and found additional narcotics. Dkt. 40 at 5.

## II.
## PROCEDURAL BACKGROUND

After his February 2, 2024, arrest, Defendant was indicted by a grand jury on one count of Possession with Intent to Distribute 50 Grams and More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(l) and (b)(1)(A)(viii). Dkt. 2. On February 24, 2025, Defendant filed the instant motion, seeking an order suppressing all evidence derived from the search and seizure of the vehicle he was driving on February 2, 2024. Dkt. 37. The Court held a hearing on Defendant's Motion to Suppress on June 5, 2025. Dkt. 62. At the hearing, the witnesses for the Government were SDUSM Salcido, TFO Bengston, and DEA Agent Mondragon. *Id.* The witnesses for Defendant were Craig Martin, a private investigator previously employed with the New Mexico State Police, and Gary Ainsworth, a private investigator. *Id.*

**The Parties' Arguments**

In his Motion, Defendant argues the evidence should be suppressed because the impoundment of the vehicle was pretextual and therefore, the purported inventory search that was conducted was unlawful. Dkt. 37 at 4-15. Defendant argues that, under *United States v. Sanders*,

"[i]mpoundment of a vehicle that is on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by (1) a standardized policy and (2) a reasonable, non-pretextual community-caretaking rationale." *Id.* at 5 (citing 796 F.3d 1241, 1248 (10th Cir. 2015)). He asserts that the impoundment was not governed by standardized policy, but even if it was, the impoundment was nonetheless pretextual and not justified by a community-caretaking rationale. *Id.* at 6-9.

The Government responds in opposition, asserting first that the warrantless search of the defendant's vehicle was consistent with the conditions of his supervised release and was reasonable under the totality of the circumstances. Dkt. 40 at 6. The Government submits that the "totality-of-the-circumstances" exception to warrantless searches applies, which is "predicated on (1) the reduced (or absent) expectation of privacy … for probationers and parolees and (2) the needs of law enforcement." *Id.* at 7 (quoting *United States v. Mathews*, 928 F.3d 968, 976 (10th Cir. 2019), *cert. denied*, 140 S.Ct. 460, 205 L.Ed.2d 285 (2019)). According to the Government, Defendant was on supervised release and therefore had a reduced expectation of privacy. *Id.* at 7-10. As to law enforcement needs, the Government submits that these needs outweighed Defendant's reduced expectation of privacy. *Id.* at 8-10. Additionally, the Government argues that the search was justified under the automobile exception to the warrant requirement, *id.* at 10, and alternatively, the impoundment of the vehicle was authorized under *Sanders*, *id.* at 11.

In his reply and closing brief, Defendant responds to the Government's position and argues the totality-of-the-circumstances exception does not apply because the warrantless search was not conducted by a probation officer, but instead by law enforcement officers. Dkt. 48 at 4. He also argues the automobile exception does not apply because there was no probable cause to believe that the sedan contained contraband. *Id.* at 4-7; Dkt. 69 at 7-9.

In the Government's closing brief, it maintains that the totality of the circumstances exception "authorizes 'searches without probable cause (or even reasonable suspicion) by police officers with no responsibility for parolees or probationers when the totality of the circumstances renders the search reasonable.'" Dkt. 68 at 9 (quoting *United States v. Warren*, 566 F.3d 1211, 1216 (10th Cir. 2009)). The Government argues that "express terms authorizing a search by both probation officers and other law enforcement officers are *not* required." *Id.* at 10 (relying on *Samson v. California*, 547 U.S. 843, 864-865, 126 S.Ct. 2193, 165 L.Ed.2d (2006)). It submits that Defendant had a reduced expectation of privacy given his terms of supervision. *Id.* The needs of law enforcement were high, says the Government, because Defendant was the subject of a DEA investigation and during the execution of a search warrant at his home fentanyl pills were found. *Id.* Additionally, at the scene, officers found $4,000 in cash in Defendant's pocket, bulk-wrapped in Saran wrap, which was an indication of drug trafficking activities. *Id.* Therefore, it argues "the totality of the circumstance exception would permit even a *suspicionless* search, and law enforcement here were well beyond that." *Id.*

## III.
## LEGAL STANDARDS

The Fourth Amendment protects against unreasonable searches of "persons, houses, papers, and effects." U.S. CONST. amend. IV. The purpose of the Amendment "is to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018). To that end, the touchstone of the Fourth Amendment is reasonableness. *United States v. Pacheco*, 884 F.3d 1031, 1041 (10th Cir. 2018) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)). Reasonableness generally requires that law enforcement obtain a warrant before a search. *Id.* (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S.Ct. 2386,

132 L.Ed.2d 564 (1995)). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

The exclusionary rule prohibits introduction of evidence directly obtained by a violation of the Fourth Amendment and evidence that is "the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed.2d 307 (1939)); *see also Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions.").

A defendant may move to suppress evidence that is "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. at 488. To prevail, a defendant "must first demonstrate that his Fourth Amendment Rights were violated." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006), *cert. denied*, 550 U.S. 949 (2007). Then, he must show "a factual nexus between the illegality and the challenged evidence." *Id.* (citation omitted). "In order for a defendant to meet his burden of showing a factual nexus, he must, [a]t a minimum . . . adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light *but for* the government's unconstitutional conduct [directed toward that complaining defendant]." *United States v. Ladeaux*, 454 F.3d 1107, 1111 (10th Cir. 2006) (alterations in original; citation omitted).

Once a defendant makes these showings, the Government must "prove that the evidence sought to be suppressed is not fruit of the poisonous tree." *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014) (internal quotation marks and citation omitted). "When a motion to suppress involves a warrantless search, 'the government has the burden of proving its warrantless actions were justified.'" *United States v. Jacobo-Rosas*, 625 F.Supp.3d 1174, 1188 (D.N.M. 2022) (quoting *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020)). In presiding over a motion to suppress, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265.

## IV.
## DISCUSSION

**A. The search of the vehicle was not authorized under the totality of the circumstances exception.**

Two exceptions to the Fourth Amendment's warrant requirement exist in the context of probation, parole, and supervised release searches. First, in *Griffin v. Wisconsin*, the Supreme Court held that "[s]upervision [of parolees] ... is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." 483 U.S. 868, 875, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). This exception, "generally described as a 'special needs search,' holds that 'it is constitutionally reasonable for a parole officer to search parolees in compliance with a parole agreement search provision, but without a warrant.'" *United States v. Matthews*, 928 F.3d 968, 975-976 (10th Cir. 2019) (quoting *United States v. Freeman*, 479 F.3d 743, 746 (10th Cir. 2007)). The "special needs" exception is not relevant here as the United States has stated it is not relying on it, presumably because there is no dispute that the search at issue was not conducted by a parole or probation officer. Dkt. 68 at 9.

The United States does, however, rely on the second exception, often referred to as the "totality of the circumstances exception," which was recognized when the Supreme Court expanded *Griffin* by holding in *United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), that "searches performed in compliance with a valid parole agreement search provision may be constitutional even if they were not 'conducted by a probation officer monitoring whether the probationer is complying with probation restrictions.'" *Freeman*, 479 F.3d at 746-47 (quoting *Knights*, 534 U.S. at 117). In assessing the reasonableness of a search conducted pursuant to a valid parole agreement, courts must balance "'on one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Knights*, 534 U.S. at 119 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).

In *Knights*, a detective suspected the defendant of several acts of vandalism and arson against a public utility company that had terminated the defendant's utility service. *Id.* at 114-15. After observing suspicious objects in the truck of a suspected accomplice parked outside of the defendant's apartment complex, the detective searched the defendant's apartment without a warrant, finding significant evidence of the defendant's involvement in the crime. *Id.* The United States Supreme Court ultimately determined the detective's search was reasonable because the defendant, who was on probation for another offense, had a diminished expectation of privacy based on the fact that he had signed a probation agreement which required him to submit to a search at any time without cause by either a probation *or* a law enforcement officer. *Id.* Under the applicable balancing test, the Court also found the Government's interest in protecting society was bolstered by the defendant's status as a probationer and by the detective's reasonable suspicion that the defendant was involved in criminal activity. *Id.*

Five years later, in *Samson v. California*, the Supreme Court "extended the principle of *Knights* to uphold a warrantless search of a [state] parolee even in the absence of reasonable suspicion, where the parolee had signed a parole agreement [required to be signed under state law] that allowed parole officers or other peace officers to search the parolee 'with or without a search warrant and with or without cause.'" *Freeman*, 479 F.3d at 747 (quoting *Samson*, 126 S.Ct. at 2196). The Tenth Circuit has "interpret[d] the *Knights–Samson* line of cases as resting on the parolee's diminished expectation of privacy stemming from his own parole agreement and [where relevant] the state regulations applicable to his case." *Id.* at 748.

In *Freeman*, the Tenth Circuit found the warrantless search of a parolee by a law enforcement officer unreasonable and unlawful under the Fourth Amendment. In that case, the defendant had been released on parole from a Kansas state prison and signed a Conditions of Post Release Supervision agreement that provided, "I agree to subject [sic] to a search by parole officer(s) of my person, residence, and any other person under my control." *Id.* at 744-45. The agreement was governed by Kansas corrections department criteria for searches of parolees, which stated that "with the exception of pat-down and plain view searches, special enforcement officers are the only personnel authorized to conduct a more extensive search of offenders' person or property." *Id.* at 744. The criteria permitted warrantless searches of parolees if the "Special Enforcement Officer (SEO) ha[d] a reasonable suspicion that evidence of a condition violation [could] be found on the person, or in the property in possession of the offender." *Id.* Subsequently, the defendant in *Freeman* was searched without a warrant by police officers, and though a representative from the state corrections department was present, this individual was not an SEO. *Id.* at 745. The Tenth Circuit reversed the district's denial of the defendant's motion to suppress. *Id.* at 743. In so doing, the Tenth Circuit focused on the fact that the search was conducted by

police officers, not parole officers (known as SEOs in the Kansas system), and no parole officer directed the police officers to do the search. *Id.* at 748. The Court wrote:

> [B]ecause the Kansas parole agreement signed by Mr. Freeman allowed searches only by SEOs, the search of Mr. Freeman's residence did not comply with the search provision in his parole agreement or with the [Kansas Department of Corrections] relevant parolee search policies. Moreover, the KDOC rules specify that a warrantless search may be conducted only on reasonable suspicion that the parolee has violated his parole agreement. Thus, when ordinary law enforcement officers conducted a search without reasonable suspicion of a parole violation, the search exceeded reasonable expectations in two respects, and was impermissible under the Fourth Amendment balancing test described in *Samson*.

*Id.*

Here, the Court finds the totality of the circumstances exception to the warrant requirement does not apply for similar reasons that it did not apply in *Freeman*.[9] Although this case does not involve state-issued criteria related to searches, it does involve a supervised release agreement signed by Defendant which informed him that he was required to submit to a search of his person, property, residence, and vehicle, and that "[t]he *probation officer* may conduct a search under this condition only when reasonable suspicion exists, in a reasonable manner and at a reasonable time, for the purpose of detecting drugs, alcohol, weapons, and any other contraband." Hr'g. Ex. 1; No. 15-CR-4009-MV, Dkt. 48 (emphasis added). To the extent this agreement lessened Defendant's expectation of privacy, it only did so regarding his expectation as to what his probation officer could or could not do to ensure compliance with his conditions of supervised release. This is not the same situation found in *Knights*, where a detective's search was reasonable because the

---

[9] The Court recognizes that *Knights–Samson* line of cases applies to those on supervised release, not just those on probation or parole. *See United States v. Dahda*, 854 F. App'x 267, 275 (10th Cir. 2021) (noting that "the *Samson* Court instructed us that on the 'continuum of state-imposed punishments ... parolees have fewer expectations of privacy than probationers.' *Samson*, 547 U.S. at 850 [ ]. And those on supervised release maintain privacy rights more akin to parolees. *Id.* (citing *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002)).").

defendant had a diminished expectation of privacy based on his parole status and on a parole agreement that stated he was subject to search by both probation officers *and* law enforcement officers. Instead, this case is more in line with *Freeman*, where the warrantless search was found unreasonable because, despite the defendant's status as a parolee, the supervised release agreement at issue authorized no other person other than a state parole officer to search Defendant or his property absent a warrant.

Significantly, the Tenth Circuit in *Freeman* rejected arguments by the Government that are similar to the arguments the Government has made here. For instance, the Government argues that "the totality of the circumstance exception would permit even a *suspicionless* search, and law enforcement here were well beyond that." Dkt. 68 at 10. This argument seems to be based on the Government's belief that Defendant Lujan had little to no expectation of privacy whatsoever based on his supervised release status and his signing of the supervised release agreement. But the Tenth Circuit rejected this broad argument, explaining that,

> [U]nlike the search provision in Mr. Freeman's parole agreement, the search provision in the California parole agreements in *Samson* allowed *any law enforcement officer* to search for any purpose without reasonable suspicion. This significantly diminished the expectation of privacy for those on parole in the California system. *Samson* does not represent a blanket approval for warrantless parolee or probationer searches by general law enforcement officers without reasonable suspicion; rather, the Court approved the constitutionality of such searches only when authorized under state law.

479 F.3d at 749. Following the holding in *Freeman*, the Court must find that the search was impermissible under the Fourth Amendment because it was conducted without a warrant by the U.S. Marshal's Task Force members, not Defendant's probation officer, and thus did not comply with the search provision of Defendant's supervised release agreement. As confirmed by *Freeman*, neither the status of Defendant nor the fact that he signed a supervised release agreement would

constitute a blanket approval for warrantless searches of Defendant's person or property by all law enforcement officers he encountered.

**B. The automobile exception to the warrant requirement does not apply because there was no probable cause to believe that the vehicle contained contraband.**

The automobile exception provides that a vehicle may be searched without a warrant if there is probable cause to believe the vehicle contains contraband. *See United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007); *United States v. Edwards*, 632 F.3d 633, 645 (10th Cir. 2001). Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "Probable cause to search a vehicle is established if, under the 'totality of the circumstances,' there is a 'fair probability' that the car contains contraband or evidence." *Edwards*, 632 F.3d at 645 (quoting *United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993) (cleaned up)). "In determining whether probable cause exists, an officer 'may draw inferences based on his own experience.'" *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002) (quoting *Ornelas*, 517 U.S. at 700).

Here, the Court finds that the Government has not met its burden to establish that probable cause existed. The Government argues there was probable cause to believe that the sedan contained drugs because:

> First, investigators arrested the defendant based on an amended petition that alleged in part that he possessed fentanyl in November 2023. Second, investigators seized a large amount of cash from the defendant that was packaged in a manner indicative of drug trafficking. And third, investigators knew from SA Mondragon that the defendant was involved in drug trafficking.

Dkt. 40 at 10-11. The Government concludes that "[t]hese facts were sufficient to give investigators probable cause to believe that drugs were in the vehicle that the defendant drove. *See*

*United States v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007) (probable cause requires only that there is 'a fair probability that a crime was being committed.').)" *Id.* at 11.[10]

The Court finds that the totality of the circumstances was not sufficient to create a fair probability that the sedan contained contraband or evidence. At the outset, the Court acknowledges the most suspicious fact: the Saran-wrapped cash found on Defendant. The Court takes into consideration the testimony that Saran-wrapped cash can be indicative of narcotics trafficking in general but notes that the cash was found on Defendant's person, and there was no testimony linking the vehicle itself to any narcotics. The Government has not identified any factually similar case that would guide the Court to find probable cause on the facts here. Conversely, Defendant relies in part on *United States v. Davis*, a case in which the Fourth Circuit reversed a district court's denial of a motion to suppress. 997 F.3d 191, 201 (4th Cir. 2021). There, the facts that the Government argued went toward probable cause were the defendant's flight from a traffic stop, his subsequent arrest, and the large amount of cash found on the defendant. *Id.* The Circuit Court concluded that these facts taken together did not support a finding of probable cause because:

> While [the defendant's] flight coupled with the cash in his pockets may have given the officers an *articulable suspicion* that evidence of a crime could be located in the vehicle, it did not give them *probable cause* to circumvent the Fourth Amendment's warrant requirement and search the vehicle. Yet "the automobile exception requires that the police have probable cause (not just reasonable articulable suspicion) to search." [*United States v. Patiutka*, 804 F.3d 684, 691 (4th Cir. 2015)]. Could a fleeing individual with cash in his pockets have evidence of some crime in his vehicle? Perhaps. But without more supporting facts available to tip the scales from "articulable suspicion" to "probable cause," the more accurate answer is, "[w]ell perhaps, but not probably." *United States v. Lyles*, 910 F.3d 787, 790–91, 794 (4th Cir. 2018) (affirming grant of motion to suppress for lack of probable cause where police obtained warrant to search defendant's entire house for

---

[10] The Government adds later that Defendant also "absconded from supervision, only heightening his awareness that law enforcement would be looking for him because he was now a fugitive from justice." Dkt. 68 at 10. The Government does not explain how this should contribute to a finding of probable cause, but the Court nonetheless considers it as part of its analysis of the totality of the circumstances.

evidence of marijuana possession based on finding three marijuana stems in his trash).

*Id.*

The Court finds the reasoning of *Davis* to be persuasive. The officers here had an individual who had approximately $4,000 in Saran-wrapped cash in his pocket and had absconded from supervision; an amended petition charging Defendant with violating his conditions of supervised release in part by possessing 4 fentanyl pills three months earlier, with no connection to the gold sedan; and a DEA investigation into Defendant for drug trafficking. While these facts may have amounted to suspicion of drug trafficking, they did not rise to the level of probable cause to believe there was evidence of a crime inside the gold sedan.

Regarding the Defendant's previous arrest pursuant to the amended petition, not only did that arrest occur approximately three months prior to the search of the vehicle at issue here, but there is also no indication that the arrest or any of the circumstances surrounding it involved the gold sedan at all. Moreover, the four fentanyl pills that were located by law enforcement officers were found in a residence, not in Defendant's vehicle. Very little, if anything, from this prior arrest indicated that drugs would be found in the gold sedan several months later. As to the Government's assertion that "investigators *knew* from SA Mondragon that the defendant was involved in drug trafficking," Dkt. 40 at 10-11 (emphasis added), the Court notes that in the Government's closing brief, it writes that Agent Mondragon began investigating Defendant for drug trafficking in May 2023, and the investigation "culminated with the execution of a search warrant at Defendant's residence on November 30, 2023." Dkt. 68 at 2. Again, there is nothing from which the Court could conclude that knowledge of this 2023 drug investigation would lead a man of reasonable prudence to believe that narcotics would be found in the gold sedan on February 2, 2024.

For these reasons, the automobile exception to the warrant requirement does not apply to the search of the vehicle driven by Defendant.

**C. The impoundment of the sedan was not lawful.**

The parties do not dispute that after Defendant was placed under arrest, TFO Bengston decided to impound the gold sedan Defendant had been driving that day. Dkt. 37 at 4; Dkt. 40 at 4. The Government claims that after the vehicle was impounded, TFO Bengston conducted a valid inventory search of the vehicle and, during that inventory, discovered the backpack which contained narcotics. Dkt. 40 at 4. Defendant argues the impoundment of the gold sedan was pretextual and therefore the purported inventory search conducted pursuant to the impoundment was unlawful. Dkt. 37 at 4.

The Government bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment. *See United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992). In *United States v. Sanders*, the Tenth Circuit articulated a two-part inquiry for assessing the constitutionality of a police-ordered impoundment when a vehicle is on private property and is "neither obstructing traffic nor creating an imminent threat to public safety." 796 F.3d at 1248. First, a court must ask whether such an impoundment was guided by standardized policy; and second, whether the impoundment was justified by a "reasonable, non-pretextual community-caretaking rationale." *Id.* Under *Sanders*, the impoundment of a vehicle from private property is constitutional "only if guided by *both* standardized criteria and a legitimate community-caretaking rationale." *Id.* at 1243 (emphasis added).

1. The Court need not determine whether there existed a standardized policy regarding the impoundment of the vehicle.

The parties disagree as to whether the impoundment of the gold sedan was guided by the requisite standardized policy. Defendant takes the position that the impoundment could not have

followed such policy because the law enforcement operation to arrest Defendant was a U.S. Marshal operation and that federal agency has no policy in place for the impoundment of vehicles. Dkt. 37 at 6. The Government argues that because TFO Bengston's home agency was the New Mexico State Police, the policy of the New Mexico Department of Public Safety ("NMDPS") applies to the impoundment of the gold sedan. The Court, however, finds it unnecessary to determine whether NMDPS policy would govern the impoundment of the vehicle in this case because the Government has failed to meet its burden of showing that the second part of the *Sanders* inquiry justified the impoundment.

    2.   <u>The impoundment of the gold sedan was not supported by a reasonable, non-pretextual, community caretaking rationale.</u>

In *Sanders*, the Tenth Circuit identified five non-exclusive factors helpful to determining whether an impoundment is justified by a reasonable, non-pretextual community caretaking rationale. Those factors include: (1) whether the vehicle is on public or private property; (2) if on private property, whether the owner has been consulted; (3) whether an alternative to impoundment exists; (4) whether the vehicle is implicated in a crime; (5) whether the vehicle's owner and/or driver consented to the impoundment. *Sanders*, 796 F.3d at 1250. Assessing the factors here, the Court finds that they weigh against the reasonableness of the impoundment.

First, the vehicle was on private property. The private nature of the property is a factor weighing against impoundment "that is entitled to more than a little weight." *United States v. Ramos*, 88 F.4th 862, 874 (10th Cir. 2023) (citing *United States v. Venezia*, 995 F.3d 1170, 1178 (10th Cir. 2021)). It does not matter that the gold sedan was parked at a home that Defendant did not own. If a car is on private property, this factor weighs against the reasonableness of the impoundment "even when the private property [does] not belong to the vehicle owner." *Id.* (citations omitted). The first factor weighs against a finding of reasonableness.

20

Second, regarding whether the property owner was consulted, the officers only knocked on the door of the residence where the gold sedan was parked. They did not call the homeowner despite a neighbor indicating they had the owner's phone number. The Court is persuaded by the Defendant's citation to *Ramos*:

> It is certainly true that "the community-caretaking interest may permit officers to impound a vehicle that interferes with a private property owner's use or enjoyment of their property." *Venezia*, 995 F.3d at 1179. *As this court's precedent makes clear, however, this is a decision left up to the private property owner, not the police. This court's decision in [United States v.] Woodard holds that guesses about a property owner's preferences, even if they turn out to be correct, are insufficient to carry this factor.* Instead, this court "consider[s] whether the officers ... consulted the property owner and learned of the property owner's preference, not whether the officers ... correctly inferred the property owner's preference." *Woodard*, 5 F.4th [1148, 1156 (10th Cir. 2021)]; *see also Venezia*, 995 F.3d at 1179 (explaining officers' "fail[ure] to ... consult ... anyone who could speak for the owner" belies contention they "impounded ... based on the ... owner's objection").

*Id.* at 876-877. The second factor therefore weighs against reasonableness.

Third, as to whether alternatives to impoundment existed, this factor weighs slightly against the reasonableness of the impoundment. On the one hand, as the Government argues, Defendant was the only driver of the vehicle, was arrested on scene, and there was no one else available to immediately take custody of the car. Dkt. 40 at 18-19 (offering string citation to cases upholding impoundments were no one else was readily available to operate the car). On the other hand, the officers did not provide an opportunity for Defendant to make alternative arrangements. *See Sanders,* 796 F.3d at 1251 (no community caretaking rationale when "police impounded Sanders' vehicle without offering her the opportunity to make alternative arrangements, even though she stated that she was willing to have someone pick up the vehicle on her behalf, and [her companion] offered to find someone to pick it up for her" and police could "be assured that the vehicle would not be abandoned."). Defendant also cites to *Woodard*, where the Court held that "the third factor [] points to pretext" where "the police had an alternative to impoundment: letting

Mr. Woodard call someone to get the car" and "[h]e had asked, and the police refused" without explaining why. Dkt. 48 at 10 (citing *Woodard*, 5 F.4th at 1156). Here, Agent Mondragon testified that he provided the name of the registered owner of the gold sedan to SDUSM Salcido at some point before Defendant was arrested. Mot. Hr'g Tr. at 172:9-22. Yet the officers did not attempt to call the owner of the vehicle or offer the opportunity to make other arrangements. The Court finds this factor weighs against the reasonableness of the impoundment.

Fourth, as to whether the vehicle was implicated in a crime, the Court has already found that the investigators did not have probable cause to believe the vehicle was implicated in a crime. Therefore, this factor weighs against impoundment.

Lastly, as to whether Defendant consented to the tow, the Government concedes that this fifth factor weighs against impoundment because Defendant did not consent to the tow. Dkt. 40 at 20. However, it argues this factor should be given little weight. *Id.* The Court acknowledges Defendant did not consent and as a result this factor weighs against the impoundment.

Considering the *Sanders* factors and all the other facts and circumstances in the record, including that the investigators began searching the vehicle almost the moment no one answered the door of the home, the Court concludes that the impoundment of the car was not supported by a reasonable, non-pretextual, community caretaking rationale. As a result, the impoundment was unreasonable and therefore the subsequent inventory search was unlawful.

**D. The evidence found in the gold sedan must be suppressed.**

Defendant moves to suppress the evidence found in the vehicle. Dkt. 37. Having demonstrated that his Fourth Amendment Rights were violated, Defendant must establish a factual nexus between the unconstitutional conduct and the evidence sought to be suppressed. *See Torres-Castro*, 470 F.3d at 999 (citing *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir.

2000)). The record here shows that absent the unconstitutional actions by the officers, the evidence found in the vehicle would not have been discovered by law enforcement. Upon Defendant's arrest, without a lawful basis to search the vehicle, the record does not show that the evidence in the vehicle would have been found.

Because Defendant has made the requisite showing of unconstitutional conduct leading to evidence that would not otherwise have come to light, it is up to the Government to prove that the drugs sought to be suppressed are not fruit of the poisonous tree. *See Mosley*, 743 F.3d at 1323. However, other than disputing the Defendant's arguments, the Government provides no evidence or argument that the evidence found in the Defendant's vehicle would have been discovered regardless of the conduct that the Court has found violated the Fourth Amendment. The evidence must therefore be suppressed.

## V.
## CONCLUSION

After careful consideration of all the evidence presented to the Court and the entirety of the record before it, the Court is not persuaded by any of the three arguments that the Government put forth to justify the search of the vehicle here – that is, (1) the totality-of-the-circumstances exception to the warrant requirement for those on supervised release, (2) the automobile exception, or (3) the community-caretaking exception for impoundments and inventory searches. The Court also concludes that, but for the unlawful conduct described herein, the contraband in Defendant's vehicle would not have been discovered. Pursuant to the exclusionary rule of the Fourth Amendment, the evidence discovered as a result of the search must be excluded.

Therefore, the Court **GRANTS** Defendant's Motion to Suppress Evidence Derived as a Result of an Invalid Seizure and Search (Dkt. 37).

**IT IS SO ORDERED.**

_____
HONORABLE DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE